**Howard T. DOUGLAS, Plaintiff,**

**v.**

**J.C. PENNEY COMPANY, INC., Defendant.**

**No. CIV.A.03–30265–MAP.**

United States District Court, D. Massachusetts.

March 30, 2006.

Lorna M. Hebert, Murphy, Hesse, Toomey, and Lehane, Quincy, for J.C. Penney Co., Inc., Defendant.

Kayla Carter, Owens J.C. Penney Co., Inc., Legal Department, Plano, TX, for J.C. Penney Co., Inc., Defendant.

Michael O. Shea, Law Office of Michael O. Shea, Wilbraham, for Howard T. Douglas Plaintiff.

James A. Toomey, Murphy, Hesse, Toomey, and Lehane, Quincy, for J.C. Penney Co., Inc., Defendant.

### MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PONSOR, District Judge.

## I. INTRODUCTION

Plaintiff Howard T. Douglas, an African–American male, has sued Defendant J.C. Penney Company, Inc. ("J.C.Penney") alleging discrimination on the basis of race and gender in violation of both federal and state law. The four-count complaint alleges that Plaintiff suffered: (1) discrimination, harassment, and a hostile work environment based on gender and sex, in violation of Title VII and Mass. Gen. Laws ch. 151B (Count I and Count III); (2) discrimination, harassment, a hostile work environment, and retaliation based on ethnicity, race, and color, in violation of Title VII and Mass. Gen. Laws ch. 151B (Count II and Count IV).[1]

---

1. Although Plaintiff uses multiple terms to describe each claim, he does not distinguish between ethnicity, race, and color, or gender and sex. The court will therefore refer to these as claims based on race or gender respectively.

Defendant has moved for summary judgment, arguing that on the undisputed facts of record, Plaintiff lacks evidence sufficient to support his claims and justify a trial.

For the reasons outlined below, Defendant's motion will be allowed.[2]

## II. *FACTS*

The facts are set forth below in the light most favorable to Plaintiff, the non-moving party. The factual record is extensive and the subject of some argument by counsel.[3] The following summary of the record, however, constitutes a fair summary of the evidence in sufficient detail to support the court's ruling.

### A. *Plaintiff's J.C. Penney Career (1993–2002).*

Plaintiff worked for J.C. Penney for approximately nine years. He was hired in Michigan in 1993 as a management trainee and was subsequently promoted to the positions of Merchandising Manager and Senior Merchandising Manager. In 1997, Plaintiff transferred to a store in Holyoke, Massachusetts, to work as Senior Merchandising Manager for the Men's Division.

During most of his tenure with J.C. Penney, Plaintiff was a successful employee who received positive performance reviews. He was consistently described in Performance Appraisals as a "high poten-

tial" employee, that is, someone in the top five percent of J.C. Penney employees. (*See, e.g.,* Dkt. No. 32, Ex. 2, Miscellaneous Performance Appraisals.) He also consistently received high "Overall Performance Ratings" on J.C. Penney's five point scale; Plaintiff was regularly rated a "2," or "exceeds expectations." (*See id.*) In both 1994 and 1995, Plaintiff received sales awards, and in 1995, he was invited, "because of [his] personal success and strong 'people skills,'" to become a mentor and "impart [his] 'process of success' to . . . trainees." (*See id.*)

After his transfer to the Holyoke store, Plaintiff's initial reviews were generally positive. In a Performance Appraisal for 1997, Store Manager Henry Lovan praised Plaintiff, noting that although he "has a very large assignment," he has "responded with solid plans of action." (*See id.*) The following year, although Lovan once again rated Plaintiff a "high potential" employee, his evaluation was slightly less favorable. Plaintiff's "Overall Performance Rating" was lowered to a "3," or "meets requirements." Lovan singled out associate development, leadership, and sense of urgency as Plaintiff's weaker areas. (*See* Dkt. No. 32, Ex. 1, Douglas Dep., Nov. 17, 2004, at Ex. 17 (rating Plaintiff "satisfactory" or "needs development" for these three areas, but "good" or "outstanding" for all six other management characteristics); *see also id.* ("Thomas is very professional in his approach to his assignment. He does

---

**2.** In addition, Plaintiff has moved to strike portions of two declarations attached to Defendant's Memorandum in Support of Summary Judgment. Plaintiff alleges that the declarations contain statements that are speculative and conclusory. Since the court has not considered the contents of these declarations, this motion will be denied as moot.

**3.** The parties' dispute reaches not only the facts but the presentation of the facts. Defendant contends that Plaintiff's Statement of

Material Facts in Dispute does not conform to Local Rule 56.1 and argues that the court should deem J.C. Penney's Statement of Material Facts admitted. Plaintiff's Statement does indeed contain "69 lengthy, verbose paragraphs" (*see* Dkt. No. 36, Def.'s Reply Mem. 2) that are four times the length of Defendant's submission. However, much of the evidence set forth *is* material to Plaintiff's theory of the case. The court will accept the parties' Statements as offered.

have opportunities in the area of communication with [an associate] and needs to give more direct leadership to his team. His other area of opportunity is with urgency in getting floor moves completed in a timely basis and being 100% set for events to get the most sales out of them. Thomas is keenly aware of what's happening with the men[']s business but he really needs to become faster at getting the department set and ready for the customers.").)

In 1999, Lovan once again gave Plaintiff a "3" for overall performance. For the first time, however, Plaintiff was not identified as a "high potential" employee. Lovan also noted that Plaintiff "needs to be able to manage his time . . . [and] improve customer satisfaction." (*See* Douglas Dep. Ex. 18.) However, Lovan praised Plaintiff's dedication, organization, and relationship with his staff, and gave higher marks for "Management Characteristics" than he had the previous year. (*See* Douglas Dep. Ex. 18.)

In the 2000 Performance Appraisal, Lovan rated Plaintiff a "4," or "not meeting minimum requirements, improvement needed." Plaintiff was warned that he had ninety days to improve his rating to a "3" or better, and informed that if his performance subsequently dropped below a satisfactory level again, his rating "could be changed to a '5' and [his] employment could be terminated." (Douglas Dep. Ex. 19.) Once again, Plaintiff was not rated a "high potential" employee. (*Id.*) Lovan also focused on Plaintiff's poor judgment, referring to Plaintiff's personal involvement with female associates at the store and disclosure of confidential information to a new associate. (*See id.* ("[Douglas] continues to show poor judgement by involving himself with female store associates resulting in conflicts in and out of store. . . . We cannot continue to have disruptive issues [concerning Douglas] and

female associates in the store.")); *id.* ("He has shared confidential associate information with a new associate and has d[i]vulged store personnel issues from an incident that occurred back in February 2000.") Lovan also noted in passing that Plaintiff's sales were down 5.5% for the year. (*Id.; see also* Dkt. No. 28, Attach. 1, Douglas Dep., Nov. 17, 2004, at Ex. 23 (noting that in fiscal year 2000, the Holyoke Men's Division ranked twenty-third out of twenty-three stores in the district).) Nonetheless, Lovan gave Plaintiff positive or satisfactory ratings for all but one of the "Management Characteristics" (*See* Douglas Dep. Ex. 19 (giving Plaintiff a rating of "ND" or "needs development" for judgment).)

Plaintiff does not believe that Lovan's Appraisal was in any way discriminatory. (*See* Douglas Dep. 142:8–16; *see also id.* at 107:12–108:24 (commenting that no J.C. Penney employee other than Store Manager Serena Olsen discriminated against Plaintiff).) Plaintiff also concedes that Lovan's Appraisal was "accurate except for" the reference to sharing confidential information. (*See* Douglas Dep. 141:15–24.). However, Plaintiff believes that Lovan rated him a "4" not as a reflection of Plaintiff's job performance, but purely on the basis of his involvement with female associates. (*See* Dkt. No. 32, Attach. 1, Pl.'s Statement Disputed Material Facts ¶ 12 ("Lovan wrote nothing in [the narrative portion of the evaluation] about sales figures and/or leadership and/or core standards being a significant issue, i.e. one calling for a '4' rating"); *id.* ¶ 13 ("Lovan wrote that Plaintiff's employment *could* be terminated, again emphasizing that the alleged social issues between the Plaintiff and female associates had been disruptive rather than emphasizing any issues with sales, coaching and/or training, core standards, cleanliness, and/or presentation standards."); *see also* Douglas Dep. Ex. 19

(only negative "Management Characteristics" rating is for judgment).)

A number of changes occurred in 2001. In January, J.C. Penney instituted a centralized buying procedure. Buying, which had previously been a key function of Senior Merchandising Managers, was transferred to a central office. As a result, Senior Merchandising Managers had their titles changed to Senior Department Managers ("SDM").[4] This new position required a greater emphasis on presentation and customer standards. J.C. Penney also introduced new "Core Standards" that it used to evaluate employees.

The Holyoke store also experienced changes in 2001. In March, Serena Olsen replaced Lovan as Store Manager. In addition, the Holyoke store endured construction and remodeling for most of 2001.

Olsen formally evaluated Plaintiff for the first time at the mid-point of fiscal year 2001. (See Douglas Dep. Ex. 20.) Douglas was once again rated a "4," or "improvement needed," and reminded of the possible consequences if he failed to improve. (Id.) Olsen noted that "[s]ales results continue to struggle below district average" in the Men's Division and singled out three factors—sense of urgency, leadership, and associate development—as "key attributes that are contributing to this loss." (Id.)

Plaintiff's submission in this litigation offers detailed objections to Olsen's mid-year Appraisal. He contends that Olsen "lodged generalized criticism" and "failed to provide specific examples." (Pl.'s Facts ¶ 16.) Olsen criticized Plaintiff both for failing to "empower" associates and for a lack of leadership; he contends that such criticism is contradictory because when he did "empower" associates by delegating tasks, Olsen used this as evidence of his failure to lead. (See id.) Plaintiff also disputes Olsen's contention that he failed to provide adequate direction to his associates; he says that he held regular meetings with associates. (See id. (citing Douglas Dep. 142–49).)

Plaintiff and Olsen met to discuss the mid-year Appraisal in late September 2001. (See Dkt. No. 32, Ex. 8, Olsen Dep. 178:11–179:3, Nov. 18, 2004.) Plaintiff then took a series of steps to address the issues raised in the Appraisal. (See generally Pl.'s Facts ¶¶ 39–45.) In early October, Plaintiff issued a memorandum to his team, which stated that 1) Plaintiff would be making all decisions about the Men's Division, 2) associates would be expected to complete a daily "to do" sheet, 3) associates would be expected to keep track of their daily sales and their daily sales goals, and 4) any associates seen "standing around" would be "challenged." (Douglas Dep. Ex. 7.) Plaintiff also held meetings with each individual associate in his department, conducted additional trainings, and took further steps to address Olsen's criticisms. (See Douglas Dep. 152:6–154:13.)

On November 29, 2001, Plaintiff arrived at work approximately four hours late because he was delayed by preparation for a real estate closing. Although Plaintiff called the store twice, he was unable to reach Olsen directly and instead left a message with the receptionist.[5] Olsen

---

**4.** Although J.C. Penney asserts that the change to the centralized buying system took place January 2001 (see Dkt. No. 29, Def.'s Mem. Supp. Mot. Summ. J., Statement Material Facts ¶ 3), Plaintiff submits evidence that his job title was changed effective October 1, 2000 (see Dkt. No. 32, Ex. 3, Job Summary).

**5.** Plaintiff explained that he called the Holyoke store twice in order to explain that he was tied up in the last steps of a home clos-

then conducted a "corrective interview" with Plaintiff based on this incident, despite the fact that he had no track record of tardiness. (*See* Olsen Dep. 70:6–11 (noting that she did not believe Plaintiff ever committed a "no-call, no-show"); *id.* 163:21–23, 166:23–167:1 (noting that Plaintiff was never tardy on any other occasion); Dkt. No. 32, Ex. 19, J.C. Penney Corrective Action Steps ("When the *number of times absent or times late* exceeds the 'Acceptable' range, hold a corrective interview." (emphasis added)).) In her write-up Olsen observed that Plaintiff "showed extremely bad judgment at a time when he should have been leading + directing people in his dep[artmen]t" because, on the day in question, associates from other stores were at the Holyoke store to help out, and "they were actually doing his job." (*See* Douglas Dep. Ex. 16.) Further, Olsen concluded, Douglas "is currently rated a "4" and has been given to the year end to improve." (*Id.*)

Plaintiff submitted a written response to Olsen's corrective action. He explained that he had expected to have adequate time to complete his personal business and did not approach Olsen in advance because he "did not feel comfortable speaking to [Olsen] concerning [his] personal life, because she is not approachable." (*Id.*) He continued, "I feel as though this corrective is also in regard to my four rating, but this is a sep[a]rate incident." (*Id.*)

Plaintiff supplemented his response a day later, adding that on the day of the incident another SDM was permitted to leave work three hours early on a personal matter. (*Id.; see* Olsen Dep. 134:16–22 (discussing fact that another SDM approached Olsen two to three days ahead of

time and requested permission to leave a few hours early).) He also reiterated his contention that Olsen was unapproachable: "As [she] was discussing my written corrective she mentioned that she had been going out of her way to not speak to me because it angered her every time she saw me, and she thought about my coming in late on Thursday, November 29, 2001." (Douglas Dep. Ex. 16.) Olsen responded that she chose not to talk to Plaintiff the day of the incident because she thought she should "cool off" before addressing the issue. (*Id.; see also* Olsen Dep. 170:19–171:4 (noting that in general she likes to cool down and think about things before she speaks about them).)

Plaintiff's 2001 Performance Appraisal was the basis for his subsequent termination. In her final review, Olsen did comment that Plaintiff had improved his sense of urgency. Olsen focused, however, on the fact that sales in the Men's Division were down 9.2%; the Holyoke Men's Division was therefore ranked twenty-third out of twenty-four stores in the local J.C. Penney district. Olsen concluded: "[Douglas] missed all 3 of his goals and has shown lack of leadership and initiative to achieve his goals. Based on the above, [Douglas'] rating is being lowered to a 5, and his employment terminated."

Plaintiff objects to Olsen's conclusions that his performance was largely unchanged by the end of the year and that termination was merited. First, he points to the steps he took to address the concerns Olsen raised in her Mid–Year Appraisal.

Second, he emphasizes Olsen's failure to note any extenuating circumstances. For example, Plaintiff approached Olsen with

---

ing. However, Olsen claims that Plaintiff failed, at the very least, to exercise "common courtesy" and may in fact have violated store policy by failing to call another management associate. (Olsen Dep. 60:2–4; *but see* Dkt. No. 32, Ex. 17, Senecal Dep. 59:7–60:2, Nov. 18, 2004 (noting that it would be acceptable to leave a message with the receptionist).)

his concern that sales goals for the Men's Division were unfairly high given the disruption caused by remodeling. (*See* Dkt. No. 32, Ex. 8, Olsen Dep. 137:18–138:10; *see also* Dkt. No. 32, Ex. 4, Douglas Aff. ¶ 6 (Construction was particularly disruptive for the Men's Division, which moved in its entirety from one floor of the store to another and endured one of the longest periods of construction work.).) Olsen explained that adjustment of sales goals to account for the remodeling was a corporate responsibility. (*See* Olsen Dep. 137:18–143:8 (corporate office may or may not have adjusted 2001 goals to account for remodeling); *see also* Dkt. No. 28, Attach. A, Ex. 2, Olsen Aff. ¶¶ 18–19 (explaining the formula she followed when assigning sales goals).) Plaintiff's division was not the only one that struggled to meet its goals during construction. (*See* Douglas Dep. 143:14–16; *see also* Douglas Dep. Ex. 24 (data showing that five of eight divisions in Holyoke store experienced sales losses for fiscal 2001, although only one division experienced losses roughly comparable to Plaintiff's).)

Plaintiff also contends that Olsen failed to follow J.C. Penney policy. The company suggests that managers follow up on negative Performance Appraisals and assist employees in improving results. (*See* Dkt. No. 32, Ex. 13, 2001 Store Performance and Career Management Review Guide ("This rating ["4"], when accompanied by action plans for improvement, says to the associate that at present he or she is not meeting expectations, but that you are concerned and *will help him or her bring performance up to an acceptable standard.*" (emphasis added)).) Plaintiff contends that despite this policy, Olsen failed to work with him to improve results after

his mid-year Appraisal. (*See e.g.,* Douglas Dep. 42:13–24; *but see* Olsen Dep. 21:7–23:8, 33:10–17, 75:12–19, 81:7–8, 151:2–152:13, 183:22–184:3 (testifying that she frequently walked the sales floor and addressed issues as they arose).)

Second, Plaintiff contends that Olsen failed to follow J.C. Penney policy on discretionary dismissal. J.C. Penney guidelines specify that discretionary dismissal of an associate should not take place until counseling, guidance, and training have been attempted. (*See* Dkt. No. 32, Ex. 21, Discretionary Dismissal 3.)[6] In addition, discretionary dismissal takes place by way of a four-step process. (*See id.*) The steps preceding termination are an oral warning, a corrective interview, and a follow-up to the corrective interview. (*See* Dkt. No. 32, Ex. 23, Action Prior to Discretionary Dismissal.) In addition to arguing that Olsen failed to follow up, Plaintiff contends that she never conducted a pre-termination corrective interview. (*See* Olsen Dep. 70:9–14 (noting that the tardiness incident for which Olsen conducted a corrective interview was not a factor in Plaintiff's termination).)

Plaintiff was terminated effective April 8, 2002, after formal review of his 2001 Performance Appraisal. Plaintiff was then replaced by a Caucasian male, Matt Geaughan. (*See* Olsen Dep. 76:19–77:13.)

B. *Allegations of Discrimination.*

i. *Comparison with Other Employees.*

Plaintiff contends that Olsen either did not discipline similarly-situated female Caucasian employees or disciplined them less harshly than she did Plaintiff. For example, in the 2001 Mid–Year Appraisal, Olsen noted that Plaintiff's department

**6.** Both this document and the one that follows are dated 1998. Although J.C. Penney objects elsewhere to Plaintiff's reliance on 2002 guidelines, Defendant raises no objection to the use of these 1998 documents.

"continues to be in need of constant cleaning." (*See* Douglas Dep. Ex. 20.; *see also* Olsen Dep. 79:21–80:11 (testifying that although Plaintiff dealt with individual cleanliness issues when they were brought to his attention, "[t]he issue really is that it should be clean all the time ... [and] he always needed encouragement or we always needed to motivate him to keep it clean").) Plaintiff notes, however, that there were cleanliness issues in other departments. (*See* Olsen Dep. 76:10–18 (confirming that there were cleanliness issues in other departments, particularly women's, and that "[i]t's an issue that is faced every day"); *see also* Douglas Aff. ¶¶ 11, 15 (observing that other managers, Hilary Lofetus and Karen Fortier, had messy departments once or twice a week).) Other managers with messy departments were not disciplined. (*See* Olsen Dep. 145:5–13 (noting that Lofetus had not been disciplined or received a bad review); Dkt. No. 32, Ex. 15, Fortier Dep. 15:9–20, Nov. 18, 2004 (noting that Fortier had never been reprimanded, warned, or received a bad review).)

Plaintiff similarly alleges that Olsen unfairly singled him out by criticizing his leadership. (*See, e.g.,* Douglas Dep. Ex. 21 ("Thomas is still lacking in his ability to coach, train and lead.").) Although Plaintiff began holding regular meetings in his department after he was admonished for his failure to do so, he saw no evidence that Caucasian female managers ever held or documented meetings in their departments. (*See* Douglas Dep. 148:12–150:11.)

Plaintiff also contends that Olsen singled him out when she took formal action to respond to Plaintiff's tardiness on November 29, 2001. There were repeated instances in which other managers came to work late or left early. (*See* Douglas Dep. 54:2–15 (Lofetus came to work 15–30 minutes late or left early approximately five times in the latter part of 2001); Olsen Dep. 53:4–55:19 (Lofetus came to work 15–30 minutes late or left early no more than four times); Dkt. No. 32, Ex. 17, Senecal Dep. 56:10–57:9, Nov. 18, 2004 (noting that if she came to work late she would just make up for that time and Olsen never gave her a hard time about doing so).) During her tenure at J.C. Penney, Olsen had never conducted a corrective interview regarding attendance or tardiness with any other manager. (*See* Olsen Dep. 57:9–58:2.)

Finally, Plaintiff felt that Olsen failed to provide him with necessary job-related information that she provided to female Caucasian managers. According to Plaintiff, he sometimes received relevant information only because he happened to "walk in on the conversation." (*See* Douglas Dep. 63:5–17; *see also id.* at 104:24–105:6; *id.* at 124:1–6 (discussing the friendly rapport Olsen had with the white female department managers).) Plaintiff raised his concerns about communication with Olsen around the time of his Mid–Year Appraisal; she agreed to work to address this issue. (*See* Douglas Dep. 131:15–132:7, 133:9–16.)

### ii. *"Those People" Incident.*

Plaintiff alleges that Olsen witnessed and tolerated an instance of racism by other managers. According to Plaintiff, one day as he, Fortier, and Susanne Senecal were about to enter a meeting, an African–American or Hispanic female associate walked by and Fortier commented, "I can't believe we let those people dress like that." (*See* Douglas Dep. 73:24–74:11.) Senecal then allegedly repeated the comment in the subsequent meeting, at which Olsen was present. (*Id.* at 74:12–18; *see also id.* at 67:4–18 (discussing the incident).) When the comment was repeated, Wenona Bowie, an African–American fe-

male manager allegedly asked, in what Plaintiff characterizes as an offended tone, "Who are 'those people?'" (See Douglas Aff. ¶ 19.) Senecal responded that "those people" referred to employees in the Juniors Department. (See id.)

Plaintiff interpreted the comments as race-based "[because of the style of the clothing and the way that it fit" and because "it was a person of color that walked by.]" (See Douglas Dep. 75:7–16.) However, Plaintiff had no recollection of other comments by Senecal or Fortier that he perceived to be based on race. (See Douglas Dep. 75:17–24.)

Senecal denied ever having referred to people of color as "those people" and testified that she never heard any other J.C. Penney employee make comments about race or ethnicity. (See Senecal Dep. 30:7–31:10.) Senecal conceded that managers discussed associate appearance at management meetings and Fortier might have commented on employee appearance, but asserted that any such remarks were not based on the employee's race or ethnicity. (See id. at 31:21–34:5.) Fortier similarly denied having made any such comment in reference to race, but conceded that managers discussed the dress code and, in particular, the fact that some young female associates occasionally dressed in a manner that violated the dress code. (See Fortier Dep. 23:11–26:12.)

### iii. "You have two black employees there standing around."

Another alleged incident took place in November 2001 when Olsen approached Plaintiff and complained that he had "two black employees there standing around." (See Douglas Dep. 79:9–15.) According to Plaintiff,

[Olsen] never referenced the white employees as white, she always called them by name. But she came back to me and said, they're standing around, they're black, when in fact they were Spanish, and I felt that that was harsh treatment because she didn't know the black or Spanish employees' names as compared to the white employees.

(See Douglas Dep. 79:16–80:2.) Plaintiff also raised this incident in early December 2001, when he wrote a response to the formal reprimand he received for being tardy. In addition to discussing the tardiness incident, Plaintiff wrote that Olsen had come up to him one day to inform him that "a short girl, older gentleman, and young black girl [were] in the quad area talking." (See Douglas Dep. Ex. 16.) He noted that he had no African–American females in his department, and it was common to see associates in any department standing around and talking in the quad areas. (See id.) Olsen stated that she did not recall using the term "black girl" and would not use that sort of terminology. (See Olsen Dep. 172:16–17; see also id. at 118:8–119:2.)

### iv. The Door Incident.

Another alleged incident occurred in November or December 2001. One of the doors that connected J.C. Penney to the rest of the mall had become jammed, and Plaintiff had contacted maintenance personnel to ask them to address the problem. Then one day, as Plaintiff and two Caucasian managers were preparing to open the store, Olsen came up to them and allegedly chastised Plaintiff, loudly and publicly, for failing to fix the door. (See Douglas Dep. 64:11–65:22; Douglas Aff. ¶ 17.) According to Plaintiff, Olsen singled him out and did not say anything to the other managers, who were equally responsible for opening the store. (See Douglas Dep. 64:20–65:1.)

### v. The Barbie Promotion.

In early 2002,[7] the Holyoke store took part in a special Barbie promotion. An African–American model was selected to make a store appearance as Barbie. According to Plaintiff, Olsen and another SDM, Lofetus, "decided not to have the black female model [and] changed it to a white female model." (Douglas Dep. 80:7–11.) Plaintiff and SDM Bowie then approached Olsen concerning the situation: "she seemed to be irritated about it, said that it was because they felt our clientele did not merit ... a black female model, and that she and [Lofetus] decided to change it to a white model." (*See id.* at 80:12–19.) Olsen testified that J.C. Penney's corporate headquarters mistakenly designated the Holyoke store as an "African–American store," based on the store demographics, and assigned a Caucasian model after Lofetus called the district office to correct the error concerning demographics. (*See* Olsen Dep. 108:19–110:20.)

## C. *Reporting Discrimination.*

In 2001, Plaintiff contacted outside J.C. Penney employees twice to discuss his concerns that he was being treated unfairly due to gender and race. In the summer of 2001, Plaintiff spoke by phone with a district level J.C. Penney Human Resources employee named Roland. (*See* Douglas Dep. 126:2–6.) Plaintiff expressed his concern that he was "not getting a fair shake [at J.C. Penney] due to some circumstances," including "personality" and race. (*See id.* at 126:10–21.) Plaintiff says that Roland told him to just "wait it out, stick

in there, and do the best [he] could." (*See id.* at 125:23–126:1.)

Later that year, Plaintiff also discussed his concerns with District Manager Steve Duran during Duran's visit to the Holyoke store. Plaintiff told Duran that he felt he "was being evaluated incorrectly based on the lack of communication [he] had with [Olsen]" and that female managers were being treated differently. (*See* Douglas Dep. 123:7–124:15.) Duran informed Plaintiff that he and Duran would sit down later to address Plaintiff's concerns. (*See id.* at 124:23–24.) As far as Plaintiff is aware, nothing happened as a result of this conversation. (*See id.* at 125:6–11.)

## III. *DISCUSSION*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine" issue exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), *cert. denied*, 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995). A "material" fact "has the potential to alter the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 428 (1st Cir.1996).

---

7. In Plaintiff's Statement of Facts, he states that this incident took place in January or February 2001. (*See* Dkt. No. 32, Attach. 1, Pl.'s Statement Disputed Material Facts ¶ 68.) There are at least two very good reasons to believe that this is a typo. First, Olsen did not become the Holyoke Store Manager until March 2001. Second, neither

of the sources which Plaintiff cites regarding this incident place it in early 2001. Rather, in her deposition, Olsen erroneously states that the incident occurred in early 2000, another implausible date. (*See* Olsen Dep. 99:5–7.) By contrast, Plaintiff testified plausibly that the incident took place in February 2002. (*See* Douglas Dep. 80:5–7.)

The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. The burden then "shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." *Sands v. Ridefilm Corp.*, 212 F.3d 657, 661 (1st Cir.2000) (quoting *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997)). The court must analyze this evidence by "view[ing] the facts in the light most favorable to the non-moving party, [and] drawing all reasonable inferences in that party's favor." *Pac. Ins. Co. v. Eaton Vance Mgmt.*, 369 F.3d 584, 588 (1st Cir. 2004) (quotation omitted).

■■■ A summary judgment motion in an employment discrimination case presents additional concerns. Courts must be "particularly cautious about granting [an] employer's motion for summary judgment" in a discrimination case where a plaintiff "makes out a prima facie case and the issue becomes whether the employer's stated non-discriminatory reason is a pretext for discrimination." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir.1998) (quoting *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928 (1st Cir.1983)). Nonetheless, summary judgment may also be appropriate where an employee's evidence regarding pretext is particularly weak. *See Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir.2003). Furthermore, even "where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)) (internal quotations omitted). However, where the non-moving party has produced something more, "trial courts should use restraint in granting summary judgment where discriminatory animus is in issue." *Hodgens*, 144 F.3d at 167 (internal quotations omitted).

Massachusetts courts take a similarly cautious approach to summary judgment in such cases:

> Summary judgment is a disfavored remedy in the context of discrimination cases based on disparate treatment. The ultimate question of the defendants' state of mind is elusive and rarely is established by other than circumstantial evidence, which requires the jury to weigh the credibility of conflicting explanations of the adverse hiring decision.

*Blare v. Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 646 N.E.2d 111, 114 (Mass.1995) (citations omitted).

### A. Disparate Treatment Based on Race or Gender.

■■ Claims for race or gender discrimination under federal or state law are governed by the familiar *McDonnell Douglas* three-step burden-shifting framework. *See Quinones v. Buick*, 436 F.3d 284 (1st Cir.2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)); *McKenzie v. Brigham & Women's Hosp.*, 405 Mass. 432, 541 N.E.2d 325, 326–27 (Mass.1989) (applying *McDonnell Douglas* framework to analysis of discrimination claim under Mass. Gen. Laws ch. 151B).

■■ First, the employee must establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The burden then shifts to the employer to "present a legitimate, non-discriminatory reason, sufficient to raise a genuine issue of material fact as to whether it discriminated against the employee, for the employment decision." *Quinones*,

436 F.3d at 289. Finally, the employee must show that the employer's non-discriminatory reason was "mere pretext," and that the "real reason" for the employment decision was discrimination. *Id.*

### i. *Prima Facie Case.*

■ To establish a *prima facie* case of race or gender discrimination based on disparate treatment, Plaintiff must show must show that (1) he belonged to a protected class; (2) he was performing his job at a level that rules out the possibility that he was fired for job performance; (3) he suffered an adverse job action by his employer; and (4) his employer sought a replacement for him with roughly equivalent qualifications. *Benoit,* 331 F.3d at 173.

■ Plaintiff easily satisfies three of the four prongs required to establish a *prima facie* case. As an African–American male, he is a member of a protected class for the purposes of both race and gender discrimination. *See* 42 U.S.C. § 2000e–2(a)(1); *see also Williams v. Raytheon Co.,* 220 F.3d 16, 19 (1st Cir.2000) ("A reasonable juror could find" that a male is a member of a protected class "in the sense that every person is in a class protected against gender discrimination."). Plaintiff's termination clearly constitutes an adverse employment action. Finally, when Defendant transferred another management employee into Plaintiff's position, it filled his job with an individual with roughly equivalent qualifications.[8]

Defendant argues, however, that Plaintiff was not performing his job adequately, and therefore cannot rule out the possibility that he was fired for job performance. Defendant points to the fact that Plaintiff repeatedly failed to meet his sales goals

and received negative evaluations from two different store managers, only one of whom is alleged to have discriminated against Plaintiff.

■ The employee's initial burden, however, "is not an onerous one." *Benoit,* 331 F.3d at 173 (citing *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Although the evaluations Plaintiff received before Olsen became Store Manager are not without criticism, for the most part they describe a level of job performance that is, at a minimum, satisfactory. As Plaintiff suggests, a jury could certainly infer that the "4" he received as his 2000 Overall Performance Rating reflected only his poor judgment in becoming involved with female associates and not a generalized criticism of his performance. Thus Plaintiff has succeeded in carrying the relatively light burden he bears in establishing a *prima facie* case.

### ii. *Defendant's Proffered Legitimate Non–Discriminatory Reason for Termination.*

■ Because Plaintiff has demonstrated a *prima facie* case, the burden shifts to Defendant to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. J.C. Penney contends that it terminated Plaintiff because he repeatedly failed to meet his sales goals and maintain company standards.

Plaintiff's failure to meet his sales goals is documented in Appraisals for 1998–2001. (*See* Douglas Dep. Ex. 17 (–8.4 % sales); Douglas Dep. Ex. 18 (–7.6% sales); Douglas Dep. Ex. 19 (–5.5% sales); Douglas Dep. Ex. 21 (–9.2% sales).) Defendant has also offered evidence to compare sales in

---

**8.** For the purposes of Plaintiff's gender discrimination claim, the fact that Plaintiff was replaced with a male has "evidentiary force,"

but does not defeat his *prima facie* case. *See Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 155 (1st Cir.1990).

Plaintiff's division with those in other Men's Divisions in the local J.C. Penney district. (*See* Douglas Dep. Ex. 23 (Plaintiff's division ranked twenty-third out of twenty-three stores in 2000); Douglas Dep. Ex. 21 (Plaintiff's division ranked twenty-third out of twenty-four stores in 2001).)

Defendant contends that Plaintiff's consistent failure to meet company standards is reflected in his evaluations. Defendant emphasizes the fact that Lovan, an individual whom Plaintiff does not accuse of discrimination, was the first person to give him a poor performance rating. In addition to the appraisals, Defendant points to Olsen's testimony regarding Plaintiff's job performance.

Defendant's articulated reason for terminating Plaintiff—Plaintiff's repeated failure to meet sales goals and company standards—is substantiated by the evidence.[9] Thus J.C. Penney has clearly met its burden to establish a legitimate, non-discriminatory reason for Plaintiff's termination.

### iii. *Pretext Analysis.*

Because Defendant has met its burden to introduce a legitimate non-discriminatory reason for Plaintiff's termination, Plaintiff must show that the reason provided by Defendant was mere pretext and the real reason for termination was discrimination. "At the summary judgment stage, the plaintiff must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason was ... discrimination." *Quinones,* 436 F.3d at 289–90 (internal citations omitted). Plaintiff may rely on the same evidence for both

tasks. *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 64 (1st Cir.1999), *cert denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082.

■ Although federal and Massachusetts law are now generally aligned on the issue of pretext, *Fite v. Digital Equip. Corp.,* 232 F.3d 3, 7 (1st Cir.2000), Massachusetts law is more favorable to plaintiffs in at least one respect, *Joyal v. Hasbro, Inc.,* 380 F.3d 14, 17 (1st Cir.2004) (citing *Lipchitz v. Raytheon Co.,* 434 Mass. 493, 751 N.E.2d 360, 366 (Mass.2001)), *cert denied,* 543 U.S. 1150, 125 S.Ct. 1325, 161 L.Ed.2d 113. A "plaintiff *may* be able— automatically and regardless of circumstances—to avoid a directed verdict and reach a jury if he ... proves that at least one of the reasons given by the defendant was pretextual." *Id.* Thus courts have assumed "*arguendo* that under Massachusetts law any deliberately false reason would get [Plaintiff] to a jury." *Id.* In an employment discrimination case, direct "smoking gun evidence is rarely found in today's sophisticated employment world." *Thomas,* 183 F.3d at 58 n. 12. Instead, in most cases the court must determine whether the inferences that can be fairly drawn from Plaintiff's evidence are sufficient to support his claims that Defendant discriminated on the basis of race and gender.

Plaintiff relies heavily on *Thomas* to argue that inferences of discrimination can be fairly drawn from the evidence he presents. In *Thomas,* the plaintiff sued her employer after she was laid off on the basis of negative performance reviews, alleging that her new supervisor's evaluations were tainted by racial bias. In reviewing the case, the First Circuit held

---

9. Shortly after Plaintiff was terminated, Olsen also terminated a Caucasian male SDM allegedly for his failure to meet sales goals. (*See*

Dkt. No. 29, Attach. A, Ex. 2, Olsen Decl. ¶ 25.)

that Title VII's prohibition of disparate treatment includes "employer decisions that are based on stereotyped thinking or other forms of less conscious bias." *Id.* at 42; *see also Lipchitz,* 751 N.E.2d at 369 n. 16 ("Employment decisions that are made because of stereotypical thinking about a protected characteristic or members of a protected class, whether conscious or unconscious, are actionable under G.L. c. 151B.").

The Court of Appeals found the following evidence of disparate treatment sufficient to survive summary judgment: a sharp drop in Thomas's performance score, a comparison between her scores and those of other employees, and evidence of additional situations in which the supervisor treated Thomas differently from other employees. *See Thomas,* 183 F.3d at 62–63. Because an employee may treat an employer differently due to unthinking stereotypes or bias, "[w]here the disparity in treatment is striking enough, a jury may infer that race was the cause." *Id.* at 64. A striking disparity in treatment is not to be confused with an employee's disagreement with a business decision. The court carefully distinguished Thomas's situation from one in which "a plaintiff . . . merely disagrees with the employer's assessment of her relative performance." *Id.* at 65. Instead,

> Thomas has presented evidence from which the trier of fact reasonably could conclude that her abilities and qualifications were equal or superior to employees who were retained.

*Id.* at 65 (internal citations and quotations omitted).

Like Thomas, Plaintiff introduces evidence of evaluations conducted by an allegedly biased supervisor and evidence that his supervisor treated him differently from other employees. Unlike Thomas, Plaintiff also points to several allegedly race-related incidents and argues that this additional evidence strengthens the inference of discrimination. The court will examine each of these three categories of evidence in turn.

### a. *Olsen's Performance Appraisals*

Plaintiff argues that Olsen's negative evaluations are evidence of discriminatory treatment or bias. He contends that his career at J.C. Penney was marked by consistent stellar performance appraisals, awards, and a steady trajectory of salary increases. *Cf. Thomas,* 183 F.3d at 43 (describing the plaintiff's glowing evaluations, awards, bonuses, and pay raises). In Plaintiff's view, his 2000 Appraisal generally praises his performance.

It was the appointment of Olsen, Plaintiff contends, that "marked a significant downturn in [Plaintiff's] fortunes at [J.C. Penney]." *See Thomas,* 183 F.3d at 45. According to Plaintiff, in her evaluations, Olsen "harped" on him for perceived violations of Core Standards and offered unsubstantiated criticism. Plaintiff also complains that when assessing him Olsen failed to take into account the effect of construction and remodeling, which caused greater disruption in the Men's Division than in many other divisions within the Holyoke Store.[10] Finally, Plaintiff contends that after delivering her negative Appraisal, Olsen failed to abide by J.C. Penney policies that required her to follow

---

**10.** In addition to questioning the propriety of the sales goals imposed on him during construction, Plaintiff also notes that he disputed the propriety of the Corrective Interview Olsen imposed and complained about his treatment to other J.C. Penney employees. Plain-

tiff compares this sequence of events to Thomas's refusal to sign two appraisals she felt were inaccurate, her complaints to Kodak staff about her evaluations, and her fear of taking formal action due to concern about retaliation. *See Thomas,* 183 F.3d at 46.

up and provide support to employees whose performance was unsatisfactory. *Cf. Thomas,* 183 F.3d at 45 (noting the presence of evidence "from which the inference can be drawn that [the supervisor] did not evaluate her skills fairly or give her appropriate opportunities for growth and success").

The facts do not support Plaintiff's contention that Olsen's arrival in March 2001 marked a significant downturn in his fortunes. Plaintiff received excellent reviews and awards through 1997. Beginning in 1998, Plaintiff's performance rating decreased, he sustained annual sales losses, and his manager singled out specific skills for improvement. By 1999, he was no longer rated a "high potential" employee. Even assuming that Plaintiff's low rating of "4" in 2000 reflected problems with judgment and not an overall evaluation of his performance, neither of his previous two appraisals can be described as stellar.

Plaintiff's attempt to compare Olsen's failure to follow up to the situation in *Thomas* also fails. The *Thomas* evidence included the fact that Thomas's supervisor traveled with other employees to observe their customer interaction, but did not do so with Thomas. *See id.* The court also described several instances in which Thomas was denied opportunities to improve her skills or further her career. *See id.* Olsen's failure to follow up with Plaintiff cannot be compared to concerted efforts to obstruct employee professional development. Moreover, there is no evidence that Olsen's evaluations were biased by her failure to observe Plaintiff in the same context in which she observed other employees.

While a jury may infer the presence of a conscious or unconscious prejudice where a disparity in treatment is striking, Plaintiff has failed to establish a striking disparity in this case. The appointment of Olsen as

store manager did not mark a significant downturn in Plaintiff's fortunes. Rather, although Plaintiff's early J.C. Penney career was marked by stellar appraisals, beginning as early as 1998, his reviews were less favorable. *Thomas* does not stand for proposition that an inference of discrimination can be drawn automatically where a new supervisor's evaluations are slightly less favorable than her predecessor's.

### b. *Comparison With Other Employees.*

Plaintiff argues that Olsen assessed Plaintiff inconsistently and treated him differently from similarly-situated Caucasian female managers. Plaintiff argues that such "weaknesses, inconsistencies, incoherencies, or contradictions" are probative of pretext. *See Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 56 (1st Cir.2000). To demonstrate Olsen's inconsistency, Plaintiff points to deposition testimony in which she stated that she did not think Plaintiff was a bad employee. In context, however, Olsen's comment is entirely consistent with her overall assessment of Plaintiff. (*See* Olsen Dep. 147:14–20 ("Q: 'Do you believe that Mr. Douglas was a bad employee?' [Olsen:] 'I don't think he was a bad employee. I don't think that he achieved his goals.' ").)

Plaintiff identifies at least four examples that allegedly illustrate a difference in treatment. First, Olsen criticized Plaintiff for his alleged failure to meet Core Standards while ignoring similar problems in other divisions. Second, Olsen allegedly failed to communicate important information to Plaintiff that she regularly conveyed to other managers. These first two examples have negligible support other than Plaintiff's subjective impressions.

Third, Plaintiff contends that Olsen singled him out for failure to ensure that a door was repaired. Even if Plaintiff and the other managers technically shared

equal responsibility for the door repair, at the time Olsen singled him out Plaintiff was the one who had contacted maintenance personnel. Olsen therefore had at least some basis for focusing her attention on Plaintiff.

Fourth, Plaintiff contends that Olsen disciplined other employees less or not at all for their tardiness problems. However, the incident with Plaintiff is clearly distinguishable from the other examples of SDM tardiness that he cites. First, the day on which Plaintiff arrived late was not a routine workday, but a day on which associates from another store were at the Holyoke store helping out. Second, Plaintiff arrived at work four hours late on the day in question, whereas the other employees arrived fifteen to thirty minutes late. Although Plaintiff notes that another employee left three hours early the day he was late, an early departure by an employee who had informed Olsen days in advance of her intentions is not the same as Plaintiff's four hour unplanned delay.

Plaintiff also argues that Olsen's anger over his tardiness is evidence of her bias, comparing this to the court's observation in *Thomas* that a supervisor's inappropriate or unprofessional behavior towards an employee may give rise to an inference of bias. *See Thomas*, 183 F.3d at 64. The First Circuit suggested that evidence of incidents showing the supervisor's "general disregard for [Thomas's] professional abilities and status" and inappropriate and unprofessional might create an inference of "conscious animus or less conscious bias." *See id.* The court did not, however, suggest that a single example in which a supervisor expressed anger at an employee's misconduct could create an inference of bias. Olsen's anger and desire to "cool off" before discussing Plaintiff's tardiness with him simply is not comparable to the evidence discussed in *Thomas*.

### c. *Evidence Related to Race.*

 Plaintiff's third category of pretext evidence consists of incidents that allegedly demonstrated racial bias. First, Plaintiff points to two incidents in which allegedly racial or racist comments were made by Olsen or in her presence. With regard to the "those people" comment, allegedly made twice by other SDMs, Plaintiff notes that management's awareness of the discriminatory statements of other employees can buttress a discrimination claim. *See Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081–84 (3d Cir. 1996). There is scant evidence, however, that Olsen was actually aware of a discriminatory statement. As Plaintiff himself explained, the reason he interpreted an ambiguous reference to "those people" as a discriminatory comment was that he had seen the individual at whom the comment was allegedly directed walk by. When the comment was repeated in Olsen's presence during the staff meeting, there is no allegation that Olsen was aware of the original context.

Olsen herself also allegedly commented that Plaintiff had "two black employees" standing around. Plaintiff points to *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23 (1st Cir.2001), in which the Court of Appeals noted that "mere generalized 'stray remarks' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance." *See id.* at 36. Plaintiff, however, ignores the First Circuit's next comment: "even if we were to assume that the assertedly offensive workplace [remark] is somehow suggestive of racial bias, it would not be significantly probative of pretext absent some discernible indication that its communicative content, if any, materially erodes the

stated rationale for the challenged employment action." *Id.* (footnote omitted). Olsen's single comment, even assuming it could fairly be construed as reflecting bias, does little to diminish Defendant's well-substantiated rationale for terminating Plaintiff based on his sales performance.

Plaintiff's also alleges that the Barbie incident demonstrated Olsen's bias. Plaintiff's argument on this point is somewhat confusing. He does not appear to contend that the decision not to use an African–American model was itself biased. Both Plaintiff and Olsen testified that the basis for the decision was the customer population of the Holyoke store. Instead, Plaintiff notes that cognitive biases may skew perception and judgments or lead to unconscious stereotyping. He then argues that there was a nexus between his complaints to Olsen and her determination that Plaintiff failed to meet Core Standards. Plaintiff fails to explain clearly how his complaints affected Olsen's evaluations; Olsen first evaluated him and found Core Standards lacking before the Barbie incident.

### d. *The Pretext Evidence Viewed as a Whole.*

 In analyzing pretext, "the court must look at the total package of proof offered by the plaintiff." *Benoit,* 331 F.3d at 174. In this case, the totality of Plaintiff's evidence is simply insufficient to meet Plaintiff's burden to demonstrate that Defendant's articulated reason for Plaintiff's termination was pretext and that the real reason was discrimination. At most, Plaintiff has demonstrated that Olsen evaluated him slightly less favorably

than her predecessor, was more critical of his shortcomings than those of other employees, and made or overheard two comments related to race.

Conscious discrimination and unconscious animus may take subtle forms that can be difficult to detect, and Plaintiff's subjective comparison of his treatment with that of other employees is perhaps suggestive. But even when combined with the two stray race-based comments, Plaintiff's evidence is not sufficient to create an inference that Defendant's substantiated, legitimate non-discriminatory reason for termination was a pretext for termination motivated by race and/or gender.

### B. *Retaliation Claim (Race).*

Plaintiff's race discrimination claim also alleges retaliation. *See* 42 U.S.C. § 2000e–3(a), Mass. Gen. Laws ch. 151B, § 4(4). "As a matter of law, [Plaintiff's] retaliation claim may be viable even if the underlying discrimination claim is not." *Benoit,* 331 F.3d at 174.

 To establish a *prima facie* case of retaliation, an employee must show that (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse job action. *Noviello v. City of Boston,* 398 F.3d 76, 88 (1st Cir.2005) (articulating the standard for retaliation under both federal and state law).

Plaintiff's retaliation claim rests on two incidents: 1) Olsen's November 2001 reference to "two black employees," and 2) the early 2002 Barbie incident.[11]

---

11. The court relies on Plaintiff's papers to define the scope of his retaliation claim. (*See* Dkt. No. 32, Pl.'s Mem. Opp. Def's Mot. Summ. J. 18–19, 19–20; *see also* Dkt. No. 2, Am. Compl. ¶ 13.) Defendant's Memorandum addresses different potential retaliation claims based on both race and gender. (*See* Dkt. No. 29, Def.'s Mem. 18–19.) Plaintiff, however, does not plead retaliation based on gender, and the court will confine its discussion of race to those incidents Plaintiff discusses.

Plaintiff establishes the first two elements of his *prima facie* case. By complaining to Olsen about perceived racial discrimination with regards to her comments and the Barbie incident, Plaintiff engaged in protected activity. His termination was an adverse employment action.

 Plaintiff has failed, however, to carry his burden on the third element of his case. Plaintiff has made no showing of a causal link between his complaints and his termination. To "survive a motion for summary judgment, the plaintiff must point to evidence in the record that would permit a rational factfinder to conclude that the employment action was retaliatory." *Santiago–Ramos*, 217 F.3d at 57. Plaintiff's cursory argument alleges that in the period after he complained about discrimination, Olsen engaged in a campaign against the Plaintiff, ostensibly for his allegedly poor job performance.

Plaintiff fails, however, to place his allegations in any temporal context. He does not distinguish between Olsen's actions before he engaged in protected activity and those that occurred afterwards. As evidence of Olsen's alleged campaign, he cites to the Mid–Year and Annual Appraisals. The former preceded any protected activity, and Plaintiff makes no attempt to argue, for example, that Olsen's second evaluation differed markedly from the first in a manner suggestive of retaliation.

Plaintiff also cites Olsen's response to his tardiness as a specific example of her retaliatory campaign, but he again fails to put the incident in context. A fair reading

of the record suggests that the tardiness incident occurred after the "two black employees" incident, but before the Barbie situation. It is insufficient, however, for Plaintiff "to simply recount that [he] complained ... and was disciplined." *Santiago–Ramos*, 217 F.3d at 58 (quotation omitted) (ellipsis in original). Similarly, the fact that Plaintiff was terminated at some point after the Barbie incident is insufficient without something more to demonstrate a causal link.

 Moreover, Plaintiff has failed to even argue that Defendant's reasons for termination were pretextual. When there is no direct evidence of retaliatory animus, to succeed on a retaliation claim, an employee must establish both a *prima facie* case and demonstrate that an employer's legitimate business reasons for termination were pretextual. *See McMillan v. Mass. Soc'y for Prevention of Cruelty to Animals*, 140 F.3d 288, 309 (1st Cir.1998) (discussing the standard for federal and state retaliation claims), *cert denied*, 525 U.S. 1104, 119 S.Ct. 870, 142 L.Ed.2d 772. As noted above, Defendant has introduced a legitimate non-discriminatory reason for termination. Plaintiff makes no attempt to claim that Defendant's articulated reason for termination was pretext for retaliation.

C. *Hostile Work Environment Claims (Race and Gender).*

Plaintiff also contends that he suffered a hostile work environment based on both race and sex.[12] *See Rocafort v. IBM*

---

12. An employer that tolerates a "hostile or abusive" environment may be liable for *either* discrimination or retaliation. *See Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 26 (1st Cir.2002). Plaintiff does not explain which of these claims he is pursuing. Because he makes no retaliation claims based on gender, the court will assume that Plaintiff alleges

gender discrimination when he claims a hostile work environment.

It is impossible to discern from counsel's submissions whether Plaintiff's hostile work environment claim based on race relies on a theory of retaliation or discrimination. In his Amended Complaint, Plaintiff alleges under Count II that he was "treated adversely and

*Corp.,* 334 F.3d 115, 120 (1st Cir.2003); *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 463 (1st Cir.1996) (noting that the concept of hostile work environment applies to both race and gender/sex cases). Title VII protects employees from discrimination based on the "terms, conditions, or privileges of employment," 42 U.S.C. § 2000e–2(a)(1), a phrase that "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotations omitted); *see also Noviello,* 398 F.3d at 92 (analyzing Title VII and 151B claims for hostile work environment together).

■ To establish a claim for a hostile work environment, Plaintiff must show (1) that he is a member of a protected class; (2) that he was subjected to unwelcome harassment; (3) that the harassment was based upon race or sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create an abusive work environment; (5) that objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. *O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir. 2001).

■ To determine whether an environment is hostile or abusive, a court must look at the totality of the circumstances. These "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367. As the First Circuit has noted, "[t]he thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Noviello,* 398 F.3d at 92.

■ Plaintiff argues that Olsen's 1) demands on the Plaintiff with reference to job performance, 2) alleged racial and gender bias, and 3) failure to follow J.C. Penney policies mandating support and guidance to struggling employees coalesced to form a hostile work environment. Plaintiff also suggests that Olsen's anger at his tardiness contributed to a hostile work environment. The first and third factors listed clearly are inadequate to support a claim: Plaintiff cannot assert that poor performance reviews and a failure to *help* him served to create a hostile work environment. Olsen's alleged discrimination and single incident of anger are also insufficient to demonstrate a hostile work environment.

There is no need for a lengthy discussion of this hostile environment theory because even an extremely generous reading of Plaintiff's allegations does not provide a basis for his claims. Plaintiff cannot satisfy most of the six elements required to make out a claim; in particular, no reasonable juror could find on this record that Plaintiff suffered severe and pervasive

differently as compared to his Caucasian co-workers and he suffered a pervasive and hostile work environment based upon ethnicity, race, color and retaliation and harassment." (Am.Compl.¶ 25.) Cursory discussions elsewhere in Plaintiff's papers do nothing to clari-

fy the nature of the race claim. (*See* Pl.'s Mem. 18–19; Dkt. No. 38, Pl.'s Sur–Reply Mem. 19–20.) Because Plaintiff's hostile work environment claim ultimately fails, the court need not resolve this question.

harassment that altered the conditions of his employment.

## IV. CONCLUSION

For the reasons outlined above, Defendant's Motion for Summary Judgment (Dkt. No. 28) is hereby ALLOWED in its entirety. A review of the record makes clear Plaintiff's sincere sense of grievance following his termination after nearly a decade with Defendant. The record might well be viewed as supporting a claim that Plaintiff was treated ungraciously and perhaps clumsily. The record will not, however, support a claim of discrimination based on race or gender.

The clerk is ordered to enter judgment for Defendant on all counts. This case may now be closed.

It is So Ordered.